193 So. 594

**SHARP et al. v. POLICE JURY OF PARISH OF EAST BATON ROUGE.**

No. 35675.

Jan. 9, 1940.

J. Oliver Bouanchaud, of Baton Rouge, for plaintiffs, appellants.

Dewey J. Sanchez, Fred S. LeBlanc, and Fred G. Benton, all of Baton Rouge, for appellee.

HIGGINS, Justice.

Certain taxpayers attacked the validity of a proposed excess revenue bond issue for public improvements on several grounds and prayed for an injunction to restrain the police jury from carrying out the program. The district judge held that the proceedings were legal and refused to grant the injunction. The plaintiffs appealed.

Our learned brother below has favored us with an opinion which covers all of the problems presented and we quote it with approval:

"The present is a suit brought by three taxpayers to enjoin the Police Jury from proceeding further in the issuance of certain excess revenue bonds under resolutions adopted by the Police Jury on the 12th day of December, 1939. These proposed bonds are first $75,000 Public Improvement Bonds, Series A of 1940, the proceeds of which are to be used for the purpose of constructing two incinerator plants in East Baton Rouge Parish, Louisiana, and second, $25,000 Public Improvement Bonds, Series B of 1940, the proceeds of which are to be used for the purpose of equipping and furnishing a library which is operated jointly by East Baton Rouge Parish and the City of Baton Rouge. It is contended that the resolutions in question are illegal, null and void and are in violation of the constitution and laws of the State of Louisiana.

"A number of grounds of complaint are enumerated in plaintiffs' petition. The first of these is that the constitution and statutes of the State of Louisiana authorizes the issuance of bonds of this type only for constructing highways and public buildings and that the construction of incinerators and furnishing and equipping a library as proposed by the Police Jury do not fall within the permitted purposes. The constitutional provision in question reads as follows:

"Article 14, paragraph 14(e) * * *

"'Indebtedness for certain public improvements—Power to fund into bonds.— The police juries of the various parishes throughout the State, for the purpose of constructing and maintaining highways or public buildings for the parish, and the governing authorities of municipal corporations, for the purpose of paving, improving or maintaining streets or alleys and for all municipal improvements, including public parks, after making provision for the payment of all statutory and ordinary charges, may fund into bonds running for a period not to exceed ten years, and bearing interest at a rate not to exceed six per centum per annum, which bonds shall not be sold for less than par, the avails or

residue of the tax authorized by this Constitution.'

"The design and description of the proposed incinerators, as worked out by the architects employed in their construction, is offered in evidence and authenticated under an agreed statement of facts. The fee title to the property upon which these incinerators are to be constructed is vested in the said Police Jury. The incinerators are for the disposal of garbage and refuse matter and are to be owned, operated and maintained by the said Police Jury for these vital purposes. It is admitted under the agreed statement of facts, and is otherwise shown in the proof beyond question that these incinerators are essential to the health and comfort of all the people who reside in the Parish of East Baton Rouge.

■ "A public building in the sense anticipated by Paragraph 14(e) of Article 14 of the Constitution of 1921 has been defined to be a building owned or controlled and held by the public authorities for public use. Brown v. State, 16 Tex.App. 245; McIntyre v. [Board of Com'rs of] El Paso County, 15 Colo.App. 78, 61 P. 237. A bridge has even been defined to be a public building. Arnell v. London, etc. R. Co., 12 C.B. 697, 74 E.C.L. 697.

"In 50 Corpus Juris, page 850 et seq., we find the following:

" 'Public Building. In a narrow sense a "public building" is a building erected and owned by state, county or municipal authorities; a building owned or controlled and held by the public authorities for public use; a building belonging to, or used by, the public for the transaction of public or quasi-public business. As so defined the term "public building" includes a high school building, a hospital, a jail, a town calaboose, or a common schoolhouse.

" 'In a broader sense it is defined as a building, which, although privately owned, may be fairly deemed to promote a public purpose or to subserve a public use; a building where the public congregates in considerable numbers either for amusement or for other purposes. As so defined the term "public building" includes a camp meeting building.

" 'As used in statutes. There is no hard and fast rule with respect to what may be included within the term "public building" and where the term is unaccompanied by words of explanation or limitation, whether it includes a particular building depends upon the general scheme or object of the statute.'

■ "A number of cases are referred to in this excerpt. It would appear that whether the expression 'public building' as used in the constitutional provision aforesaid is to be interpreted in a narrow or in a broad sense in any event there is no doubt whatever but that the proposed incinerators in this case are public buildings.

■ "A public library is likewise undoubtedly a public building in the sense of said constitutional provision. The question presented here is as to whether or not furnishing and equipping such a library falls within the logical meaning of the language 'constructing' a 'public building.'

A public building is of necessity one which is to be employed for a public purpose. Thus the language 'constructing a public building' must of necessity mean the actual finishing and equipping of the building so that it can fulfill its logical destination, as a public use, or a public function. A library without necessary equipment and books would fail of its purpose altogether. If the Police Jury is vested with authority to construct a public library by using its excess revenue for such purpose and by funding this revenue into bonds running for a period not to exceed ten years after making provision for the payment of all statutory and ordinary charges, it follows inevitably that the authority so granted must include every essential step in the process by which a building once begun— and however it may have been begun—can be carried to completion where its public use becomes an accomplished fact.

■ "The further point is made that the public library here involved is not owned by the Police Jury. Under the agreed statement of facts it is shown, however, that it is owned by the City of Baton Rouge and held by the Police Jury of the Parish of East Baton Rouge under an agreement, certified copies of which are attached to the agreed statement of facts, the nature of which shows that while the title to the library is in the municipality it is to be operated as a parish wide library by and at the expense of the said Police Jury. Under the agreement between the City and the Police Jury the said library is to be operated as a public building for a public purpose. I believe this suffices to satisfy the requirements of the law. Brown v. State, 16 Tex.App. 245.

"The contention is made in paragraph ten of plaintiffs' petition that in respect to the proposed issue of $25,000, a considerable part of the proceeds are in fact to be used for the purchase of books. It is claimed the principal purpose of the proposed issue is thus for the maintenance of said library, and that it is not a public improvement for which revenue bonds of the nature here involved can be issued. The books of a public library are not only indispensable to the public purpose for which any such building is constructed as above stated, but these books are as much a part of the capital investment as the cost of the foundation of the building itself, if not more vitally so. Necessary library books are an indispensable part of the building process and the evidence here shows the purchase of these books is essential.

■ "The further point is made that the law requires the available millage to be determined on the basis of statements of revenues and expenditures approved by the Police Jury for the current year, whereas in the present case these statements of revenues and expenditures are for the ensuing fiscal year. Act 40 of 1922 is the enabling statute under which the Police Jury is acting. This act provides in section 6 that there is to be 'spread upon' the 'minutes' of the Police Jury 'an itemized statement of its statutory and ordinary charges for the current year, and all of its obligations contractual or otherwise, omitting there-

from any debts secured by special taxes and none other.' There is attached to the agreed statement of facts a certified copy of the resolutions adopted by the Police Jury. These resolutions literally and otherwise fully comply with the requirements of the statute. The law anticipates the budget of the Police Jury for any given year is to be adopted at some reasonable time during the latter part of the preceding year. Here the Police Jury adopted its budget in final form for the year 1940 on the 24th day of October, 1939. Naturally the budget for 1940, or any given year, is to be computed from the standpoint of the statutory and ordinary charges for the year in which it applies, and also from the standpoint of the anticipated revenues for that year. It is true that said act in section 6 refers to an itemized statement of its statutory and ordinary charges for the current year, and also refers to an 'itemized statement of its current revenues which show the yearly amount of taxes to be realized, based upon the assessed valuation of the taxable properties of such political subdivision to be ascertained by the last assessment for parish or municipal purposes previous to the issuing of such bonds * * ' Here the proposed public improvement bonds are to be dated in 1940, which is the current computation upon which the required calculations have been made. All payments in principal and interest depend upon charges and revenues beginning in 1940, and subsequent thereto during the ten year life of said bonds. Apparently only two cases have been decided by the Supreme Court of this state under act 40 of 1922. These are the cases of Montgomery v. City of Lafayette, 154 La. 822 [98 So. 259], and Police Jury of Acadia Parish v. Fidelity National Bank & Trust Co., 161 La. 514 [109 So. 50]. There is nothing in these cases contrary to the conclusions herein reached.

"It is also said that the statement employed by the Police Jury as a basis for said bonds does not show revenues 'reasonably certain of collection legally' within the meaning of the statute, in that in several instances the amounts approved are greater than is justified by the history of collections over the past few years, and in any event that there is no certainty these indicated sources will produce the estimated amounts for the ensuing year. The testimony of Mr. Amiss, the Secretary of the Police Jury and the finance officer for the past sixteen years clearly disproves the correctness of these claims. On the contrary it is shown that the current revenues, as well as estimated revenues, upon which these bond issues are predicated have been conservatively computed, and that it will be entirely reasonable to expect said revenues to be greater. The same point was made in Montgomery v. City of Lafayette, supra. There the municipality attempted to fund into bonds certain anticipated revenues and took into account alleged profits to be derived from the future operation of the City water and light plant. These were held by the court to be speculative and uncertain as depending upon various conditions and contingencies the exact nature of which could not be in any sense clearly

foreseen. There the court said [154 La. 822, 98 So. 261]:

" 'The courts have had occasion to consider what are "available sources of revenue reasonably certain of collection legally" and they have interpreted the phrase to mean "available sources of revenue beyond reasonable doubt." '

"This is exacting a maximum degree of proof, and yet if the anticipated revenues are calculated from the standpoint of the actual tax structure only as legally defined by the statute, as is true in this case, it must of necessity follow that the necessary showing has been made. In the present case it is not shown that in the statement in question the Police Jury has taken into account anything other than revenues that will be collected under existing constitutional statutory provisions, the validity of which with one exception hereafter discussed have not been questioned.

■ ■ "It is argued that the chain store tax is subject to change or repeal at any time. The evidence shows that the necessary revenue will be available even if the whole amount of the chain store tax is eliminated. Nevertheless, the argument is untenable, as the validity of the tax in question has been passed upon by the Supreme Court of this State, and by the Supreme Court of the United States. To say that an existing tax law the validity and constitutionality of which has been sustained by the court is subject to repeal or modification in the future is in no sense a sound argument to refute the correctness of the Police Jury's position in this case

that the revenues upon which the Police Jury relies are reasonably certain of collection legally.

"It is further contended that there is included in the statement of estimated revenues for 1940 gasoline tax in the sum of $125,000.00, without which there would be no available excess revenue for the liquidation of the proposed bonds in principal and interest, and that this gasoline tax is collected by the State of Louisiana under the authority of Act 87 of 1936, as amended by Act 19 of 1938, whereunder a two cent tax is levied and collected, one cent of which is turned over to the parishes of the state to be used for any public purposes, but that the said Act 87 of 1936, as amended, is not authorized or provided for under the constitution of the State of Louisiana, and is in addition to five cents gasoline tax that is authorized by the constitution, and that therefore the constitutional mandate in respect to the five cents gasoline tax operates as a restriction upon the legislative power to impose any other or additional gasoline tax. The contention is based upon State v. Liberty Oil Company, 154 La. 267, 97 So. 438, and State v. Mahr [La.App.], 151 So. 907. In the first of these cases the court was called upon to interpret Act No. 81 of 1921 [Ex.Sess.], under which the legislature attempted to impose a gasoline tax in pursuance to section 21 of Article 10 of the Constitution of 1921. The tax was drawn as a license law, whereas the said constitutional provision anticipated the levying of a tax in the form of a sales tax that could be passed on to the ultimate consumer who would be the

beneficiary of the roads and highways which were to be constructed out of the proceeds of the tax. Subsequently the Legislature itself recognized the invalidity of the statute and enacted Act 137 of 1922 to conform to the constitutional mandate, and in this enactment specifically repealed the said act 81 of 1921 [Ex.Sess.] In declaring the invalidity of the act 81 of 1921 [Ex.Sess.] the court said [154 La. 267, 97 So. 439]:

" 'Learned counsel for the state argues that since there is no prohibition in the Constitution of 1921 against the imposition of double taxation whether in the form of a license, or a tax, upon vendors of gasoline, the Legislature was well within its power in adopting the statute.

" 'Whatever might be the force of the argument in a proper case, it can have no application to the issues presented here, for, admittedly, the law was enacted in an attempt to comply with the mandatory provisions of the Constitution requiring the levying of a tax, not to exceed two cents per gallon, on gasoline sold in the State. The statute, neither in spirit nor in substance, conforms to the constitutional provision authorizing its enactment. It was plainly not the intention of the framers of the Constitution that the constitutional provision should be used as the basis for the imposition of a license tax upon oil dealers already subject to the payment of a license tax under the law, but it was their evident purpose to place the burden of this specific taxation upon the ultimate consumer, the beneficiary of the roads and highways to which the proceeds of the tax are to be devoted by the Constitution itself. The constitutional mandate operates as a restriction upon the legislative power to impose any other tax, and in any other manner, than is therein provided. Act No. 81 of 1921 [Ex.Sess.] is therefore invalid, null, and void.'

"In State v. Mahr [La.App.], 151 So. 907, 910, a similar question was presented. There the court was called upon to interpret the gasoline tax law as it was amended subsequent to said Act 137 of 1921 [1922], based directly upon the constitutional mandate contained in section 21 of Article 10, as amended. The court was still construing a tax law expressly levied under a constitutional grant. The contention was made that the amount collected by the State to represent penalties, attorney's fees and costs exceeded the maximum allowed by the Constitution. The court stated:

" 'Defendant Mahr urges the unconstitutionality of the act, in so far as penalties and attorney's fees are concerned, basing same on the fact that the Constitution limits the amount of tax to be placed on gasoline, and that when penalties and attorney's fees are added, it exceeds the amount allowed by the Constitution. There is no prohibition in the Constitution against charging a delinquent taxpayer either interest or penalties, when the delinquency forces the state to proceed judicially in order to collect the tax. The grant of power to tax carries with it authority to use all means to accomplish the object, and the imposition of penalties is a legitimate means of collecting revenues.'

"The tax which has been included in the Police Jury statement is derived from Act 87 of 1936, which is not based upon or restricted by any constitutional provision. In the case referred to the court went no further than to say if the Constitution authorizes a tax of any kind and the Legislature attempts to carry out any such constitutional mandate the constitutional provision operates as a restriction upon the legislative power to impose any other tax, and in any other manner than is therein provided. The court has not been referred to any constitutional provision and knows of none under which the Legislature was prohibited expressly or impliedly from adopting said Act 87 of 1936. The act shows on its face that it is a valid exercise of police power, and of the taxing power which is inherent in the State Legislature unless it be restricted or inhibited in some fashion by the Constitution.

"Accordingly judgment will be entered denying plaintiffs' application for preliminary injunction and recalling and dismissing the rule nisi issued herein at the plaintiffs' cost."

In connection with the point with reference to the bonds for a public library, we supplement the above opinion by pointing out that under Section 14(e), Article 14 of the Constitution of 1921, as amended, the governing authorities are authorized to issue excess revenue bonds not only to build public buildings but, also, to maintain such buildings and, therefore, it would appear that where the purchase of equipment and books is to be regarded as mainte-nance of a public library, the expenditure for that purpose is legally justified.

For the reasons assigned, the judgment is affirmed at the appellants' costs.